## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| TAMARA CARROLL<br>4673 East Main Street<br>Columbus, Ohio 43213, | ) ) ) | CASE NO. |
| | ) | JUDGE: |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| DEDICATED COLUMBUS OHIO LLC<br>5156 East Main Street<br>Columbus, Ohio 43213, | ) ) ) ) | **JURY DEMAND ENDORSED HEREIN** |
| **Serve Also:** | ) ) | |
| Dedicated Columbus Ohio LLC<br>c/o CT Corporation System<br>4400 Easton Commons Way<br>Suite 125<br>Columbus, Ohio 43219, | ) ) ) ) | |
| Defendant. | | |

Plaintiff, Tamara Carroll, by and through undersigned counsel, as her Complaint against Defendant Dedicated Columbus Ohio LLC ("DCO"), states and avers the following:

### PARTIES AND VENUE

1. Carroll is a resident of the city of Columbus, Franklin County, Ohio.

2. At all times herein, Carroll was acting in the course and scope of her employment.

3. DCO is a domestic corporation that does business at 5156 E. Main Street, Columbus, Ohio 43213.

4. DCO is and, at all times herein, was an employer within the meaning of R.C. § 4112.01 *et seq.*

5. DCO is a resident of the State of Ohio.

6. At all times herein, Christopher Hollinger was acting in the course and scope of his employment with DCO as a Care Supervisor.



The Employee's Attorney.

7. At all times herein, Robbie Pruith was acting in the course and scope of his employment with DCO as a Center Director.

8. At all times herein, Keera White was acting in the course and scope of her employment with DCO as a Care Supervisor.

9. All of the material events alleged in this Complaint occurred in Franklin County.

10. Personal jurisdiction is proper over DCO pursuant to R.C. § 2307.382(A)(1) and (4).

11. Venue is proper pursuant to Civ. R. 3(C)(2).

12. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

13. Carroll has filed charges with the Ohio Civil Rights Commission ("OCRC") for claims of age, gender, and disability discrimination and sexual harassment.

14. Carroll will seek leave to amend this Complaint upon receipt of her Notice of Right to Sue from the OCRC to add counts for age, gender, and disability discrimination and sexual harassment.

## FACTS

15. Carroll is a former employee of DCO.

16. Carroll worked for DCO as a medical assistant.

17. Carroll began working for DCO on July 27, 2020.

18. Hollinger did not participate in the decision to hire Carroll.

19. Pruith did not participate in the decision to hire Carroll.

20. White did not participate in the decision to hire Carroll.

21. Carroll had an exemplary employment record with no history of discipline in the year that Carroll worked for DCO.



22. Carroll worked for DCO at their Whitehall location located at 5156 E. Main Street, Columbus, Ohio 43213.

23. Carroll is over 40 years old.

24. In or about April 2021, Ayla Combs, a younger medical assistant for DCO, instigated a verbal altercation with Carroll in the workplace.

25. Combs is under 40 years old.

26. Combs escalated this verbal altercation, causing other employees from DCO to step in.

27. Following this altercation, Carroll received a text message from Combs stating that, "no one likes you here, and we are all trying to get you fired."

28. Fewer than two months after this incident, DCO moved Carroll from the Whitehall location to DCO's West Broad Street facility.

29. On or around October 13, 2021, Tammy was called into a meeting with Hollinger and Pruith.

30. Hollinger and Pruith told Carrol that she was going to be replaced at the West Broad Street facility by Combs, a younger medical assistant.

31. Carroll was also told she was being relocated back to the Whitehall facility.

32. However, two days later, Hollinger informed Carroll that her employment was terminated.

33. DCO treated Carroll unfairly because of her age.

34. DCO terminated Carroll's employment and replaced her with a significantly younger employee.

35. Carroll's "reassignment" to another facility was a pretextual justification to remove Carroll from her position and replace her with a younger employee.

36. In or around April 2021, Carroll pulled her back while lifting with a patient.

37. At the time, DCO had two other employees out because of injuries suffered at work.

The Employee's Attorney.™



38. When Carroll asked about filing for workers' compensation benefits, Angela Lacomb, and Supervisors White and Hollinger told her not to file.

39. White told Carroll, "Do you know how much paperwork this is? Get some lidocaine patches, they work great."

40. Also, in or around April 2021, after Carroll's injury, Carroll disclosed to Hollinger that she suffered from post-traumatic stress disorder, had been diagnosed with depression, and anxiety, and that she was bi-polar (Carroll's "Mental Health Diagnoses").

41. Fewer than six weeks after revealing her diagnoses to Hollinger, Carroll was transferred to the West Broad Street facility.

42. Fewer than six weeks after revealing her diagnoses to Hollinger, Hollinger began sexually harassing Carroll and threatening her job.

43. On or around October 1, 2021, Carroll was assisting a patient out of a minivan so they could enter the facility.

44. While Carroll was helping to unload this patient into a wheelchair, Carroll pulled a muscle in her back.

45. Carroll was disabled as a result of her injuries.

46. Alternatively, DCO perceived Carroll to be disabled as a result of her injuries.

47. Carroll was disabled as a result of her Mental Health Diagnoses.

48. Alternatively, DCO perceived Carroll to be disabled as a result of her Mental Health Diagnoses.

49. Carroll once again told Hollinger about her injury.

50. Hollinger responded with, "does it warrant the paperwork?"



51. Carroll had previously been through this in April 2021, so she knew that DCO would prevent her from filing for workers' compensation benefits once again.

52. Fewer than two weeks later, DCO terminated Carroll's employment on October 15, 2021.

53. DCO treated Carroll unfairly based on her disabilities and prevented her from filing a workers' compensation claim.

54. Carroll suffered two separate injuries to her back within six months because of her work at DCO.

55. Although these were two separate occurrences, the response to both incidents remained the same: DCO prevented Carroll from filing a workers' compensation claim.

56. DCO prevented Carroll from exercising a statutory right to file a workers' compensation claim because one of their employees being injured on the job, "wasn't worth the paperwork."

57. After Carroll told Hollinger about her mental health diagnoses, DCO moved Carroll to the West Broad Street location.

58. After Carroll told Hollinger about her mental health diagnoses, DCO began the process of replacing Carroll with a non-disabled employee and ended Carroll's employment.

59. DCO terminated Carroll in violation of Ohio law.

60. In or around June 2021, after Carroll was assigned to the West Broad Street facility, Hollinger gave Carroll his personal phone number at a happy hour for DCO employees.

61. Hollinger stated that he did this, "in case she ever needed anything."

62. Within weeks of providing his personal number, Hollinger began sending sexually suggestive text messages.

63. Hollinger sent text messages commenting on Carroll's body.

64. Hollinger sent text messages requesting sexually explicit photos or acts from Carroll.

The Employee's Attorney.™



65. Hollinger sent text messages threatening Carroll's job if she didn't comply with his requests.

66. Carroll told Hollinger on multiple occasions that these messages were beyond inappropriate ("Hollinger's Explicit Texts").

67. On or around July 15, 2021, Hollinger came to Carroll's home after work hours.

68. Hollinger brought over alcohol and attempted to instigate sex with Carroll by kissing Carroll and trying to undress her ("Hollinger's First Sexual Assault").

69. Carroll told Hollinger that she was not interested and that he needed to leave.

70. Hollinger told Carroll the next time he came over, she was to wear nothing but a robe ("Hollinger's Robe Comment").

71. On or around July 22, 2021, Carroll attended another work happy hour.

72. At the happy hour, Hollinger told Carroll that she should, "sober up at [his] place down the street."

73. When Carroll entered Hollinger's house, Hollinger ordered her to, "take [her] bra off or you're fired." ("Hollinger's Second Sexual Assault").

74. Feeling that her job was directly threatened, Carroll felt like she had no choice.

75. Hollinger led Carroll through the house and up to his bedroom, where he displayed his entire collection of sex toys.

76. Hollinger told Carroll about his, "open lifestyle" with his wife.

77. Hollinger then told Carrol just how great sex with him would be.

78. Carroll felt extremely uncomfortable and left Hollinger's home.

79. Hollinger continued to inappropriately text and make comments to Carroll after these incidents.

80. Hollinger continued to make threats to Carroll's job if she did not comply with his demands.

The Employee's Attorney.™ 

81. Carroll attempted to continue working and not report these matters because of the direct threats Hollinger made to her job.

82. Carroll there after began to decrease her communication with Hollinger.

83. On or around September 22, 2021, Carroll told Hollinger she planned on reporting his behavior to human resources at DCO.

84. Later that day, Carroll briefly left her desk.

85. When she returned, a Starbucks card had been taken out of her wallet.

86. Carroll also noticed her phone was in a different place than she left it.

87. Carroll checked her phone and found all text messages with Hollinger had been deleted.

88. Hollinger knew how to access Carroll's phone.

89. Hollinger had previously taken Carroll's phone and taken pictures on himself on her phone.

90. Carroll asked Director Priuth to access security camera footage, as one of the security cameras was right above her desk.

91. Pruith denied this request and told Carroll the footage was unavailable.

92. After Carroll told Hollinger she was going to report his behavior and stopped responding to his inappropriate messages, Carroll found that her workload increased.

93. Hollinger told Carroll that she was, "the subject of some "complaints."

94. Hollinger, nor anyone in management at DCO, gave Carroll any evidence of actual complaints.

95. On or around October 13, 2021, Hollinger and Pruith informed Carroll that she was to be moved to the Whitehall facility.

96. On or around October 13, 2021, Hollinger and Pruith informed Carroll that she was being replaced by Combs.

97. Hollinger fired Carroll on October 15, 2021.

The Employee's Attorney.™ 

98. DCO treated Carroll differently because of her gender.

99. Carroll suffered severe sexual harassment from her direct supervisor Hollinger.

100. On multiple occasions, Hollinger gave Carroll an ultimatum of complying with his sexually explicit requests or she would be fired.

101. Hollinger made inappropriate advances on Carroll both in the workplace and at of social events for DCO employees.

102. When Carroll told Hollinger she would go to human resources about this, Hollinger deleted his grossly inappropriate correspondence with Carroll to cover his tracks.

103. When Carroll asked to see what would clearly show Hollinger covering his tracks, Pruith blocked Carroll from seeing the evidence.

104. Shortly after Carroll stopped complying with Hollinger's ultimatums, DCO terminated Carroll's employment. DCO terminated Carroll' employment in violation of Ohio law.

## COMPANY POLICIES

105. DCO has a progressive disciplinary policy ("Discipline Policy").

106. A verbal warning is the lowest level of discipline in the Discipline Policy.

107. Carroll did not receive a verbal warning before the Termination.

108. A written warning is a higher level of discipline than a verbal warning in the Discipline Policy.

109. Carroll did not receive a written warning before the Termination.

110. A termination is the highest level of discipline in the Discipline Policy.

111. DCO knowingly skipped progressive disciplinary steps in terminating Carroll.

112. DCO knowingly terminated Carroll's employment.

113. DCO knowingly took an adverse employment action against Carroll.

8

The Employee's Attorney.™



114. DCO knowingly took an adverse action against Carroll.

115. DCO intentionally skipped progressive disciplinary steps in terminating Carroll.

116. DCO intentionally terminated Carroll's employment.

117. DCO intentionally took an adverse employment action against Carroll.

118. DCO intentionally took an adverse action against Carroll.

119. DCO knew that skipping progressive disciplinary steps in terminating Carroll would cause Carroll harm, including economic harm.

120. DCO knew that terminating Carroll would cause Carroll harm, including economic harm.

121. DCO willfully skipped progressive disciplinary steps in terminating Carroll.

122. DCO willfully terminated Carroll's employment.

123. DCO willfully took an adverse employment action against Carroll.

124. DCO willfully took an adverse action against Carroll.

125. As a direct and proximate result of DCO's conduct, Carroll suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

126. DCO has a policy against sexual harassment ("Sexual Harassment Policy").

127. DCO's Sexual Harassment Policy precludes retaliation against employees who complain about sexual harassment.

128. Alternatively, retaliation against employees who complain about sexual harassment is permitted by DCO.

129. DCO's Sexual Harassment Policy precludes intimidation against employees who complain about sexual harassment.

130. Alternatively, intimidation against employees who complain about sexual harassment is permitted by DCO.

9

The Employee's Attorney.™



<pre>
Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Apr 08 4:27 PM-22CV002308
Case: 2:22-cv-02191-MHW-CMV Doc #: 4 Filed: 05/17/22 Page: 10 of 17 PAGEID #: 50
</pre>

131. DCO's Sexual Harassment Policy requires employees to report what they reasonably believe is a violation of the Sexual Harassment Policy.

132. DCO's Sexual Harassment Policy precludes retaliation against employees who report a violation of the Sexual Harassment Policy.

133. Alternatively, retaliation against employees who report a violation of the Sexual Harassment Policy is permitted by DCO.

134. DCO's Sexual Harassment Policy precludes intimidation against employees who report a violation of the Sexual Harassment Policy.

135. Alternatively, intimidation against employees who report a violation of the Sexual Harassment Policy is permitted by DCO.

136. Hollinger's Explicit Texts violate the Harassment Policy.

137. Hollinger's Robe Comment violates the Harassment Policy

138. Hollinger's First Sexual Assault violates the Harassment Policy

139. Hollinger's Second Sexual Assault violates the Harassment Policy

140. DCO has a policy to investigate reports of unsafe conditions.

141. DCO has a policy to investigate reports of violations of its Sexual Harassment Policy.

142. An investigation should include interviewing the complainant.

143. An investigation should include interviewing the subject of the complaint.

144. An investigation should include interviewing the subject of the reported discrimination.

145. An investigation should include interviewing witnesses to the reported discrimination.

146. An investigation should include getting a written statement from the complainant.

147. An investigation should include getting a written statement from the subject of the complaint.

<pre>
</pre>

<pre>
The Employee's Attorney.™
</pre>



148. An investigation should include getting a written statement from the subject of the reported discrimination.

149. In response to Carroll's report of Hollinger's Explicit Texts, DCO did not interview Carroll.

150. In response to Carroll's report of Hollinger's Explicit Texts, DCO did not interview Hollinger.

151. In response to Carroll's report of Hollinger's Explicit Texts, DCO did not interview witnesses.

152. In response to Carroll's report of Hollinger's Explicit Texts, DCO did not get a written statement from Carroll.

153. In response to Carroll's report of Hollinger's Explicit Texts, DCO did not get a written statement from Hollinger.

154. In response to Carroll's report of Hollinger's Explicit Texts, DCO did not get a written statement from witnesses.

155. DCO did not investigate Carroll's report of Hollinger's Explicit Texts.

156. In response to Carroll's report of Hollinger's Robe Comment, DCO did not interview Carroll.

157. In response to Carroll's report of Hollinger's Robe Comment, DCO did not interview Hollinger.

158. In response to Carroll's report of Hollinger's Robe Comment, DCO did not interview witnesses.

159. In response to Carroll's report of Hollinger's Robe Comment, DCO did not get a written statement from Carroll.

The Employee's Attorney.℠



160. In response to Carroll's report of Hollinger's Robe Comment, DCO did not get a written statement from Hollinger.

161. In response to Carroll's report of Hollinger's Robe Comment, DCO did not get a written statement from witnesses.

162. DCO did not investigate Carroll's report of Hollinger's Robe Comment.

163. In response to Carroll's report of Hollinger's First Sexual Assault, DCO did not interview Carroll.

164. In response to Carroll's report of Hollinger's First Sexual Assault, DCO did not interview Hollinger.

165. In response to Carroll's report of Hollinger's First Sexual Assault, DCO did not interview witnesses.

166. In response to Carroll's report of Hollinger's First Sexual Assault, DCO did not get a written statement from Carroll.

167. In response to Carroll's report of Hollinger's First Sexual Assault, DCO did not get a written statement from Hollinger.

168. In response to Carroll's report of Hollinger's First Sexual Assault, DCO did not get a written statement from witnesses.

169. DCO did not investigate Carroll's report of Hollinger's First Sexual Assault.

170. In response to Carroll's report of Hollinger's Second Sexual Assault, DCO did not interview Carroll.

171. In response to Carroll's report of Hollinger's Second Sexual Assault, DCO did not interview Hollinger.



172. In response to Carroll's report of Hollinger's Second Sexual Assault, DCO did not interview witnesses.

173. In response to Carroll's report of Hollinger's Second Sexual Assault, DCO did not get a written statement from Carroll.

174. In response to Carroll's report of Hollinger's Second Sexual Assault, DCO did not get a written statement from Hollinger.

175. In response to Carroll's report of Hollinger's Second Sexual Assault, DCO did not get a written statement from witnesses.

176. DCO did not investigate Carroll's report of Hollinger's Second Sexual Assault.

177. As a direct and proximate result of DCO's conduct, Carroll has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**COUNT I: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

178. Carroll restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

179. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating an employee to avoid a Workers' Compensation claim.

180. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he/she engages in protected activity under Ohio law.

181. Specifically, in *Sutton v. Tomco Machine*, the Ohio Supreme Court noted "we recognize a common-law tort claim for wrongful discharge in violation of public policy when an injured employee suffers retaliatory employment action after an injury but before he or she files,



13

The Employee's Attorney.

institutes, or pursues a workers' compensation claim." (*Sutton v. Tomco Machine*, 129 Ohio.St. 3d 153, 163 (2011)).

182. DCO's termination of Carroll jeopardizes these public policies.

183. DCO's termination of Carroll was motivated by conduct related to these public policies.

184. DCO had no overriding business justification for terminating Carroll.

185. As a direct and proximate result of DCO's conduct, Carroll has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT II: BREACH OF CONTRACT

186. Carroll restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

187. Carroll participated in a profit-sharing agreement (the "Contract") offered to employees of DCO.

188. Employees at DCO are entitled to profit-sharing distributions on a quarterly basis.

189. DCO's third quarter ended on or around September 30, 2021, while Carroll was still employed.

190. On or around October 15, 2021, when Hollinger told Carroll that her employment was terminated, he also informed her that she had forfeited her profiting sharing distribution.

191. Carroll employment ended weeks after DCO's third quarter had ended.

192. Carroll has yet to receive any funds she was entitled to from the third quarter of 2021.

193. By withholding these funds from a mutually agreed upon contract, DCO breached their profit-sharing Contract.

194. DCO terminated Carroll without just cause.

195. Carroll substantially performed under the terms of the Contract.



196. DCO failed to substantially perform under the Contract.

197. As a direct and proximate cause of Defendant's conduct, Carroll suffered, and will continue to suffer damages.

### COUNT III: PROMISSORY ESTOPPEL

198. Carroll restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

199. DCO guaranteed Carroll profit-sharing distributions on a quarterly basis.

200. DCO made promises to Carroll to make these distributions in exchange for her work during the quarter.

201. DCO made these promises with the reasonable expectation that its promises would induce action or forbearance by Carroll.

202. Carroll, to her detriment, actually and justifiably relied on DCO's promises by performing this work.

203. An injustice to Carroll may only be avoided through the enforcement of DCO's promises.

### COUNT IV: UNJUST ENRICHMENT

204. Carroll restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

205. Carroll provided DCO value by working for DCO as an employee.

206. Carroll expected to be compensated in accordance with the Contract for the value provided to DCO.

207. DCO acknowledged, accepted, and benefited from the value provided by Carroll.

208. It would be inequitable for DCO to enjoy the benefit of the value provided by Carroll without compensating her in accordance with the Contract.

The Employee's Attorney.™



## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Carroll respectfully requests that this Honorable Court grant the following relief:

(a) Issue a permanent injunction:

    (i) Requiring DCO to abolish discrimination, harassment, and retaliation;

    (ii) Requiring allocation of significant funding and trained staff to implement all changes within two years;

    (iii) Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to investigate complaints promptly and/or take effective action to stop and deter prohibited personnel practices against employees;

    (iv) Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    (v) Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

(b) Issue an order requiring DCO to restore Carroll to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(c) An award against Defendant of compensatory and monetary damages to compensate Carroll for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;



(d) An award of punitive damages against Defendant in an amount in excess of $25,000;

(e) An award of reasonable attorneys' fees and non-taxable costs for Carroll claims as allowable under law;

(f) An award of the taxable costs of this action; and

(g) An award of such other relief as this Court may deem necessary and proper.

          Respectfully submitted,

          */s/ Trisha M. Breedlove*
          Trisha M. Breedlove (0095852)
          Gregory T. Shumaker (0095552)
          **SPITZ, THE EMPLOYEE'S LAW FIRM**
          1103 Schrock Road, Suite 307
          Columbus, Ohio 43229
          Phone: (614) 683-7331
          Fax:   (216) 291-5744
          Email: trisha.breedlove@spitzlawfirm.com
                     greg.shumaker@spitzlawfirm.com

          *Attorneys for Plaintiff Tamara Carroll*

## JURY DEMAND

Plaintiff Carroll demands a trial by jury by the maximum number of jurors permitted.

          */s/ Trisha M. Breedlove*
          Trisha M. Breedlove (0095852)
          Gregory T. Shumaker (0095552)

